**UNITED STATES of America, Plaintiff,**

v.

**Jesse PIERCE, Defendant.**

**Crim. A. No. 21114.**

United States District Court,
N. D. Ohio, E. D.

Aug. 11, 1954.

Sumner Canary, U. S. Atty., and Eben H. Cockley, Asst. U. S. Atty., Cleveland, Ohio, appeared for the United States.

Thaddeus C. Toudor, of Chicago, Ill., and Marc J. Wolpaw, of Cleveland, Ohio, appeared for defendant.

McNAMEE, District Judge.

In a trial to the court without a jury the defendant was convicted of the charge of making an unlawful purchase

of ten ounces of heroin in violation of Title 26 U.S.C.A. § 2553. Police officers who searched the defendant's traveling bag without a warrant, found therein ten glassine envelopes each of which contained approximately one ounce of heroin. The search was made shortly after and incident to the arrest of the defendant without a warrant at about 5:45 a. m., November 5, 1953, in the Cleveland Union Terminal. The defendant was arrested upon his arrival by train from Chicago, Illinois as a result of information obtained by police officers and a Government narcotic agent through listening to telephone conversations between the defendant and an informer named Grant Washington.

In his motion for a new trial the defendant attacks the validity of the search, and renews the arguments made on the hearing of his motion to suppress the evidence and at the trial. As a statement of facts will disclose, the lawfulness of the arrest and the validity of the search cannot be seriously questioned, unless the testimony of the law-enforcement officers in respect of the telephone conversations heard by them was improperly received in evidence. The important issue raised by this motion is whether this testimony is prohibited by Section 605 of the Federal Communications Act, 47 U.S.C.A. § 605. The essential facts are:

In the late afternoon of November 4, 1953 detectives of the Cleveland Police Department arrested Grant Washington and another person in whose room narcotic drugs were found. A slip of paper bearing a Chicago telephone number was found upon the person of Washington. He told the police officers that the 'phone number was that of a man then known to him only as Jesse, from whom on several occasions he had procured deliveries of heroin. Washington expressed his willingness to call Jesse by 'phone and order heroin and permit the police officers to listen to the conversation between them. The Cleveland Police Department had no funds with which to make long distance calls, and arrangements were made with the Federal Narcotics Bureau to have the call made by that agency. Washington was brought to the office of the Narcotics Bureau in the Federal Building, and at about 7:00 p. m. on November 4 he called Jesse's number in Chicago. In the conversation that followed, Washington told Jesse that he wanted ten pieces, meaning ten ounces, of heroin, and Jesse replied in substance that he would see what he could do and call Washington later that evening. Police officers Savage and Cobb listened to the telephone conversation between Washington and Jesse on two extensions of the connection over which Washington spoke, and a narcotic agent of the Government heard the conversation by placing his ear close to the receiver used by Washington. After this conversation was completed, Washington was taken to his home by Agent Fialkewicz and Officer Cobb, who remained there with him. About 11:00 o'clock that evening Washington made a second call to Jesse but was unable to reach him. However, a few minutes later the long distance operator connected him with Jesse. At that time Jesse told Washington that "he had made connections," that a cab was waiting outside his home and that he was leaving for Cleveland in about forty minutes. There was no extension 'phone in Washington's home, but both Officer Cobb and Agent Fialkewicz testified that by placing themselves in proximity to the receiver of Washington's 'phone, they heard the above statements made by Jesse. The officers then checked the schedules of all available means of transportation between Chicago and Cleveland and learned that a train due to arrive in Cleveland at 5:37 a. m. was leaving Chicago about forty minutes after the second telephone conversation above noted. Shortly before the arrival of the train, four narcotic agents and four police officers accompanied by Washington, went to the Cleveland Union Terminal. As Jesse came up the stairway from the train shed to the concourse of the station he was recognized by two of the officers

as the man whom Washington had described. As Officer Savage stated, he matched Washington's description "perfectly." The defendant was stopped by the officers and, upon inquiry, he told them that his name was Jesse Pierce and that he came from Chicago. He was then asked for further identification through his draft registration card, which he exhibited to the officers. After showing this card, he was placed under arrest. Meanwhile Washington, who was some distance away from the arresting officers, pointed to the defendant as the man with whom he had talked over the telephone. The defendant was told to open his baggage, but he stated that he had left the keys in Chicago. The officers then took him to the Central Police Station and there one of the officers opened Pierce's traveling bag with one of the keys found in Pierce's possession. As indicated above, the ten ounces of heroin were found in the traveling bag.

In view of the cooperation of the state and federal officers and the prosecution of the defendant in this court, the legality of the search must be determined by the same principles that would be applicable if the arrest of the defendant and the search of his traveling bag had been made solely by federal agents.

 It is fundamental that not every search and seizure made without a warrant is illegal. As the Supreme Court said in United States v. Rabinowitz, 339 U.S. 56, 60, 70 S.Ct. 430, 432, 94 L.Ed. 653:

"Yet no one questions the right, without a search warrant, to search the person after a valid arrest. The right to search the person incident to arrest always has been recognized in this country and in England. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652."

See also Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

 State law determines the validity of arrests without warrant. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210. Revised Code of Ohio, Section 2935.04 provides:

"When a felony has been committed, or there is reasonable ground to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained."

Certainly the facts and circumstances within the knowledge of the officers were sufficient in themselves "to warrant a man of reasonable caution in the belief" that the defendant was guilty of a felony in the unlawful possession of narcotic drugs in violation of Section 3719.02 of the Revised Code of Ohio, and Section 2553 of Title 26 U.S.C.A. Indeed, the only fair and reasonable inference to be drawn from the defendant's appearance in the railroad station in Cleveland in the early morning of November 5, 1953 is that he was there to deliver narcotic drugs to the informer, as he indicated he would in the telephone conversations heard by the officers but a few hours before. There was abundant justification for the arrest of the defendant without a warrant. Nor can any question arise concerning the practicability of obtaining warrants for the arrest or search. It was not until about 11:00 p. m. on November 4 that the officers received definite information that the defendant was leaving Chicago for Cleveland to deliver the heroin. All other considerations apart, it appears clearly that it would have been impracticable if not impossible to obtain warrants between the hours of 11:00 at night and 5:00 a. m. the following day.

 The argument that error was committed in the hearing on the motion to suppress in permitting the officers to give hearsay testimony relating to Washington's statements about his illegal dealings with the defendant merits only passing notice. It is well settled that hearsay testimony, coupled with testimony based on the officers' personal

knowledge, may be received at hearings on motions to suppress evidence. United States v. Bianco, 3 Cir., 189 F.2d 716; United States v. Li Fat Tong, 2 Cir., 152 F.2d 650; Gilliam v. United States, 6 Cir., 189 F.2d 321. However, the issue whether the testimony of the officers relative to the telephone conversations heard by them is prohibited by Section 605, Title 47 U.S.C.A., merits more extended comment. The pertinent part of Section 605 reads:

"* * * and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; * * *."

Wire tapping and the divulgence of information obtained by such means is prohibited by the above quoted language of the statute. Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314. See also Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298.

The Supreme Court has not passed upon the precise question here presented. But in United States v. Polakoff, 112 F.2d 888, 889, the Second Circuit Court of Appeals had before it facts that were essentially identical. There the prosecuting witness talked with the accused through a telephone in the office of the F.B.I. The conversations were recorded upon a machine attached to an existing extension in another room. As noted by the Court of Appeals in that case, the governing principles of law would have been the same if the conversations merely had been listened to instead of being recorded. In holding the recordings to be inadmissible as evidence, Judge Learned Hand defined "intercept" by saying:

"* * * anyone intercepts a message to whose intervention as a listener the communicants do not consent; the means he employs can

have no importance; it is the breach of privacy that counts."

The Second Circuit Court of Appeals was aware of the definition of "intercept" as stated in United States v. Yee Ping Jong, D.C., 26 F.Supp. 69, but refused to accept it. The opinion in the Polakoff case, written by one of the greatest living judges, is entitled to the utmost respect. However, its precedential value is to be determined not only by the prestige of the author and the reasons supporting the decision; consideration must be given to the exceptionally able dissenting opinion of Judge Clark in that case and to the pertinent statements of the Supreme Court in Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, in defining the term "intercept." Account must be taken also of the concurring opinion of Judge Chase of the Second Circuit Court of Appeals in Reitmeister v. Reitmeister, 162 F.2d 691, and finally to Judge Learned Hand's own language in Reitmeister, in which he apparently modifies substantially his definition of "intercept" as stated in Polakoff.

As indicated in his dissenting opinion in the Polakoff case, Judge Clark was persuaded that the definition of "intercept" as stated by Judge Gibson in Yee Ping Jong, supra, was correct. In this connection Judge Clark said:

"As pointed out in U. S. v. Yee Ping Jong, D.C.W.D.Pa., 26 F.Supp. 69, the verb 'intercept' means 'to take or seize by the way, or before arrival at the destined place' (Webster's New International Dictionary, 2d Ed.), and does not aptly refer to a communication which has reached its intended destination and is recorded at one end of the line by one of the participants or, it should be added, by his direction. Reasons of policy justify the making of telephonic communications privileged for the two parties involved; they do not justify making them so privileged to one party as against use by the other."

Judge Clark also pointed out that under the construction of the statute by the majority not only would law-enforcement officers be seriously handicapped in ferreting out crime but such construction would serve to make criminal offenses of many of the normal and natural uses of telephone conversations by private individuals. Section 501 of Title 47 U.S.C.A. provides that any person who knowingly and willfully does anything prohibited by this Act is guilty of an offense. Thus, under the holding in Polakoff, a private secretary could not listen to, transcribe and later divulge a telephone conversation between her employer and another; a person would not be able by such means to protect himself against misconstruction of his statements; and one who had been blackmailed and threatened in a telephone conversation would be denied the right to offer corroborative evidence in support of his own testimony in respect of the threats received in this manner. It is unreasonable to suppose that Congress intended any such undesirable results to flow from the enactment of Section 605.

The definition of "intercept" in Yee Ping Jong, supra, also received the approval of the Supreme Court in Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 995, 86 L.Ed. 1322. In that case statements made by Shulman into the transmitter of a telephone were recorded upon a detectaphone set against the wall of an adjoining room. In commenting upon the meaning of the term "intercept" the Supreme Court said:

"The same view of the scope of the Communications Act follows from the natural meaning of the term 'intercept'. As has rightly been held, this word indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, *or after, or at the moment, it*

*comes into the possession of the intended* receiver." (Emphasis supplied.)

The court then cited Yee Ping Jong, supra, in a footnote. The Supreme Court also said in Goldman that:

"The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation." 316 U.S. at page 133, 62 S.Ct. at page 995.

In Judge Chase's concurring opinion in Reitmeister v. Reitmeister, 2 Cir., 162 F.2d 691, 697, he refers to the above quoted statements of the Supreme Court, and the opening statement of his opinion is:

"Because I do not believe that our decision in United States v. Polakoff, 2 Cir., 112 F.2d 888 has survived that of the Supreme Court in Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, * *."

Of particular interest is the language of Judge Learned Hand in Reitmeister following his comment on the Goldman case. In this connection Judge Hand said:

"There was no doubt that the 'detectaphone' had 'intercepted' Shulman's message as he spoke it into the receiver in the same sense that an eavesdropper would, who was hidden in a closet; but the court held that the section did not apply to such a situation. The message must be 'intercepted' by some mechanical interposition in the transmitting apparatus itself, for the message, though sent over the wire, is not immune from disclosure; but only the interjection of an independent receiving device between the lips of the sender and the ear of the receiver."

An interception which must be accomplished "by some mechanical interposition in the transmitting apparatus itself" is not the same as the "interception" defined in Polakoff, where the

means employed were said to be of "no importance." These later expressions of the courts in opposition to Polakoff seem clearly to forecast general judicial acceptance of Judge Clark's well reasoned dissent in that case as constituting a correct construction of Section 605.

In all cases except one where the District Courts have decided or discussed the issue here presented, it has been held that the testimony of officers who listened to or recorded conversations, was admissible. United States v. Guller, D.C., 101 F.Supp. 176; United States v. Sullivan, D.C., 116 F.Supp. 480; United States v. Yee Ping Jong, supra. Contra: United States v. Stephenson, D.C., 121 F.Supp. 274, 277. In the Stephenson case, Parsons, who was the receiver of the message, attached a device to the wiring in the bell box of his telephone and in this manner recorded the conversation between himself and the defendant. Judge Pine held that this constituted an "interception", stating that "both in space and time, the taking in this instance was before the arrival of the communications at the destined place." There was no third person involved in the recording of the conversation in the Stephenson case, but Judge Pine took the view that the words "no person" as used in Section 605 included the intended receiver of the telephone message. No comparable situation is presented here. In this case there was no interference with the means of communication. The conversations were heard by the officers "at the moment" they came "into the possession of the intended receiver." There was no interception as that term has been defined by the Supreme Court in Goldman.

There can be no doubt that one of the purposes of the statute is to protect the privacy of telephone conversations against interference with the means of communication. But the statute defines no duties of the communicants, each to the other, in relation to messages received by wire. Telephone conversations have not been raised to the status of privileged communications as that doctrine is recognized in the law of evidence. There is no prohibition in Section 605 against disclosure of the content or purport of a telephone message by either party to the conversation. Nor does the section proscribe the disclosure of a conversation by a third party who listened to it through the regular channels of reception with the permission of the recipient of the message. But even if the statute were construed to sustain a privilege against disclosure of unintercepted communications by one party without the consent of the other, or the more limited privilege against disclosure by one who had listened to the conversation with the consent of one of the communicants, such privileges would not survive in the factual context shown by the record in this case.

It is well settled that the highly favored privilege granted to confidential communications between attorney and client is withdrawn whenever the subject matter of the communication involves plans or preparations for the commission of crime. 58 Am.Jur., p. 288, sec. 516; Wigmore on Evidence, 3rd ed., Vol. VIII, sec. 2298; Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 469, 77 L.Ed. 993. In the Clark case Mr. Justice Cardozo said that the privilege protecting communications between attorney and client "takes flight if the relation is abused." He added: "A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." Those considerations of public policy which are of sufficient weight to deny the privilege attached to the confidential communications between attorney and client are relevant in a consideration of the issue whether testimony relating to telephonic communications involving fraud and criminality ought to be suppressed. It is true that in the first Nardone case [302 U.S. 379, 58 S.Ct. 277] the Supreme

Court expressed the view that "Congress may have thought it less important that some offenders should go unwhipped of justice than that officers should resort to methods deemed inconsistent with ethical standards and destructive of personal liberty." But that case involved the issue of the admissibility of testimony obtained through an interference with the means of communication which was expressly prohibited by Section 605 and which also constituted a criminal offense. However, there is no warrant for imputing to Congress a purpose to protect violators of the law from the exposure of their criminal designs as revealed in telephone conversations, if the means employed in listening to those conversations do not constitute an unlawful interception.

As shown by the record, the facts here present a case of eavesdropping with the permission of one of the parties to the conversation. In principle, the eavesdropping of the officers in this case is indistinguishable from the eavesdropping of the public officials in Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322, and On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270, where it was held that the information obtained by such means was admissible in evidence. Section 605 subjects the offender to a criminal penalty and, upon well settled principles, that section ought not to be enlarged by construction to interdict procedures and practices not expressly or by clearest implication prohibited by the language employed.

▆ I find nothing in the terms of the statute or in any considerations of public policy that forbids the reception in evidence of testimony of the officers who, with the consent of Grant Washington, listened to the telephone conversations between him and the defendant.

The motion for a new trial is overruled.