UNITED STATES, Appellant and Cross-Appellee

v.

DONALD JOSEPH DeLEON, Personnelman Second Class (T), U. S. Navy, Appellee and Cross-Appellant

5 USCMA 747, 19 CMR 43

748

No. 5234

Decided May 6, 1955

John Cye Cheasty, Esq., Major Charles J. McCaffrey, USMCR, and CDR Robert W. Collins, USNR, for Appellee and Cross-Appellant.

CAPT James A. Turley, USMCR, and ENS Mitchell W. Rabbino, USNR, for Appellant and Cross-Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This case presents an aspect of the wire tap problem. At the trial, the accused contended that certain evidence was the "poisoned fruit" of a telephone conversation obtained in violation of the Communications Act which prohibits persons "not being authorized by the sender" to "intercept . . . and divulge" such communications. 47 USC Section 605.

Jones, a transfer yeoman in the Administrative Office of the U. S. Naval Receiving Station, Brooklyn, New York, was approached by the accused, who was an interviewer in the Separation Office, with regard to effecting the early separation of two reservists. The accused had met the reservists, both of whom were hospitalmen, during a visit to the sick bay. On learning that they were anxious to leave the service, he told them that he would try to help but it would cost them $25.00. They indicated agreement. Accomplishment of the discharges entailed alteration or removal of certain entries in the service records of the prospective separatees which related to their reserve drill pay status. The accused told Jones of this, and offered to divide equally the money he would receive. Jones did not commit himself. A few days later, however, he made full disclosure of the plan to Lt. Amico, the station legal officer.

On Lt. Amico's instructions, and using a telephone in the legal office, Jones called the accused at the Separation Office. Lt. Amico's secretary listened in on the conversation over an extension telephone. She took stenographic notes which were later transcribed. In addition, the Transient Personnel Officer, Chief of the accused's section, listened on another telephone located in the adjoining office of the Discipline Officer. The latter instrument was assigned a different number from that in the legal office but it could be directly connected by means of a switch on the instrument. The telephones in both offices were extensions of the base telephone number, which was included within the New York Telephone Company system.

The purpose of Jones's call was to get the accused "to repeat all of the material part of the plan and . . . to execute the plan immediately" so that he could be apprehended. It was believed that further delay might lead the accused to solicit someone else for the plan. Jones was not provided with a detailed list of the points to be covered, but the general course of the conversation was established.

The law officer refused to admit testimony of the conversation on the ground that it was obtained in violation of the wire tap provision of the Communications Act. However, the Government was permitted to show that directly after the call, the accused went to the proposed separatees. He informed them that Jones needed money for the impending Labor Day weekend. Representing that they could not spare more than $5.00 each, the reservists gave the accused $10.00. The accused then went to Jones' office. He gave Jones the money and received an envelope containing a number of pages from the service records of the separatees. As the accused started to leave the office, he was apprehended by a master-at-arms. The latter had been posted there to witness the transaction and to arrest the accused as soon as the transaction was completed.

The court-martial convicted the accused of seven offenses committed in the course of the aborted scheme. One of the charges was dismissed by the initial reviewing authority. On appeal, the board of review held that, as a matter of law, it was bound by the law officer's ruling on inadmissibility of the telephone conversation. It concluded that a substantial part of the evidence relating to two of the specifications (Specifications 3 and 4, Charge III) was derived from the telephone conversation, and, accordingly, should

have been excluded. It set aside the findings of guilt as to those offenses and dismissed the charges. It dismissed two other charges for insufficiency of evidence of guilt, affirmed the findings of guilt on the remaining two offenses, and modified the sentence by reducing the period of confinement at hard labor from twelve months to six months.

The Judge Advocate General of the Navy certified the following issues for review:

"(1) Was the law officer correct in his ruling that the accused was the sender of the communication and that the communication was intercepted within the meaning of Section 605, Federal Communications Act, 47 USC 605?

"(2) Was the action of the Board of Review correct in setting aside the findings of guilty to specifications 3 and 4 of Charge III for the reason that they were substantially supported by 'tainted' evidence derived from a telephone communication which had been illegally intercepted in violation of Section 605 of the Federal Communications Act?"

Additionally, we granted the accused's petition to consider the sufficiency of the evidence to support the findings of guilty affirmed by the board of review.

In United States v. Noce, 5 USCMA 715, 19 CMR 11, we pointed out that Congress did not intend the **Headnote 1** Communications Act to apply to every kind of communication system. We concluded that the prohibitions of Section 605 did not apply to a communication over a self-contained, exclusively operated military system. Also excluded from the scope of Section 605 are privately operated systems of communication which are not connected with regularly licensed facilities. On Lee v. United States, 343 US 747, 96 L ed 1270, 72 S Ct 967; Casey v. United States, 191 F2d 1, (CA 9th Cir 1951) rev. on other grds, 343 US 808, 96 L ed 1317, 72 S Ct 999.

The telephone call here originated on and was received at a place located on a Navy base. The evidence also indicates that the telephones used are extensions to a telephone which is part of a regular commercial system. It does not appear, however, that a call may be made from an extension telephone to an off-station number, without first calling the operator or dialing a code number to effect a trunk connection. Cf. United States v. Noce, supra, page 721. It may be argued, therefore, that in the absence of an outside connection the extension system is merely a private means of intramural communication which is not within the purview of Section 605 of the Communications Act. However, for the purposes of this case, we shall assume that the system used is within the purview of the Act. See Weiss v. United States, 308 US 321, 84 L ed 298, 60 S Ct 269.

Section 605 provides that no person "shall intercept . . . and divulge" a communication without authority "from the sender." The Act does not define the words "intercept" and "sender." It has been suggested that the word "sender" describes only the originator of the communication; hence, his authorization to divulge satisfies the statute. See United States v. Lewis, 87 F Supp 970, 973, (DC) rev. on other grounds, sub nom Billeci v. United States, 184 F2d 394 (CA DC Cir). However, Judge Learned Hand of the Second Circuit has taken the position that in a telephone call each party is "alternately sender and receiver," and the originator cannot surrender the right of the receiver to be protected against unauthorized interception and disclosure. United States v. Polakoff, 112 F2d 888, 889, (1940). More recently, for the purposes of the particular case, the Court of Appeals for the District of Columbia Circuit "assumed" the correctness of the latter view. Sullivan v. United States, 219 F2d 760. See also United States v. Stephenson, 121 F Supp 274, 277 (Md), appeal pending in United States Court of Appeals for District of Columbia Circuit, Docket No. 12421. In order to narrow the issues here, we may make the same assumption. The question then is

whether listening to a conversation over an existing extension tele- ▮▮▮▮▮ ▮ phone, with the knowledge and consent of only one of the parties to the call, constitutes an unauthorized interception within the meaning of the Communications Act.

In what seems to be the first reported case on the subject, District Judge Gibson concluded that the word "intercept," as used in Section 605, was limited to its dictionary meaning; that is, "To take or seize by the way, or before arrival at the destined place." He held that when one of the parties to a telephone conversation has knowledge of and consents to the attachment of a recording device to the telephone wire within the house and a recording is made of a conversation between that party and another, there is no interception within the meaning of the statute. United States v. Yee Ping Jong, 26 F Supp 69, 70 (WD Md 1939). But, in the Polakoff case, Judge Hand disagreed with Judge Gibson. He concluded that "anyone intercepts a message to whose intervention as a listener *the communicants do not* consent; the means he employs can have no importance." (Emphasis supplied.) Ibid, page 889. Judge Clark filed a strong dissent in which he approved the construction given to Section 605 in the Yee Ping Jong case. Two years later, the Supreme Court held that the term "intercept" has a "natural meaning."

". . . The same view of the scope of the Communications Act follows from the natural meaning of the term 'intercept.' As has rightly been held, this word indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver.[8] The listening in the next room to the words of Shulman as he talked into the telephone receiver was no more the interception of a wire communication, within the meaning of the Act, than would have been the overhearing of the conversa-tion by one sitting in the same room." (Goldman v. United States, 316 US 129, 134, 86 L ed 1322, 62 S Ct 993.)

Note 8 set out in the opinion is a footnote reference to the Yee Ping Jong case. The Supreme Court's citation, however, did not eliminate the earlier judicial difference as to the construction of the statute. In Reitmeister v. Reitmeister, 162 F2d 691, 696 (CA 2d Cir 1947), Judge Learned Hand adhered to his previous interpretation. He concluded that the Supreme Court had not overruled the Polakoff case, and he could not "see why an existing lead off the main circuit was different from a 'tap' into the wire, made ad hoc." However, in a separate concurring opinion, Judge Chase maintained that the Polakoff decision did not survive that of the Supreme Court in the Goldman case. In part, he said (pages 697–698):

"It seems to me that the opinion in the Goldman case makes it abundantly clear that, 'The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation.' Page 133 of 316 US, page 995 of 62 S Ct, 86 L Ed 1322. When this appellant sent the messages to the persons to whom he intended to talk in Louis Reitmeister's office by means of the telephone connection to that office designated by a call number listed under Louis Reitmeister's name the destination to which he sent them by the method he chose was one which included all telephone receivers in that office and when his messages were received, without previous diversion, at that destination the requirements of Sec 605 were fulfilled.

". . . It is true that the facts in the Goldman case differ from those in the instant case, but if more is needed to show that the construction there given the statute is applicable here it is found in the sentence in that opinion immediately following the last above quotation from it. 'The listening in the next room to the words of Shulman as he talked into the telephone receiver was no more the interception of a wire communication within the meaning of the Act,

than would have been the overhearing of the conversation by one sitting in the same room.'

"The 'overhearing' by the recording instrument in the appellee's office was no more the interception of a wire communication than the overhearing of the messages by a person at that place would have been. Because these messages ceased to be wire communications within the meaning of the statute as soon as they became audible at the receiving station called, the Communications Act did not thereafter apply to make their preservation an unlawful interception or their use an unlawful disclosure."

United States District Court judges are also divided in opinion as to the full scope of the wire tap provision. But, the reported cases seem to indicate general acceptance of the view that there is no violation of the Act when a third person, with the consent of one of the parties to a telephone conversation, listens to it over an extension instrument. In United States v. Stephenson, supra, District Judge Pine held that as to the person receiving a telephone call it was an interception to record the conversation by means of a mechanical device attached to the wiring in the bell box of the originator's telephone. Although Judge Pine cited Judge Learned Hand's opinion in the Reitmeister case, he also supported his conclusion by referring with approval to United States v. Guller, 101 F Supp 176 (ED Pa 1951). In the Guller case, a Federal agent rented two rooms in a Philadelphia hotel. One was registered in the name of the agent and the other in the name of a police informer. By means of an extension, the agent listened to a telephone conversation between the informer and other persons. Denying the defendant's motion to suppress evidence allegedly obtained by the agent as a result of conversations to which he had listened, District Judge Follmer said (page 178):

". . . The interception forbidden by Section 605 of the Communications Act of 1934, 47 USCA § 605, must be by some mechanical inter-

positions in the transmitting apparatus itself, that is the interjection of an independent receiving device between the lips of the sender and the ear of the receiver. Reitmeister v. Reitmeister, 2 Cir, 162 F2d 691, 694.

"In Goldman v. United States, 316 US 129, 62 S Ct 993, 86 L Ed 1322, the Supreme Court held that the use by federal agents of a detectaphone, whereby conversations in the office of a defendant were overheard through contact on the wall of an adjoining room, did not violate the Fourth Amendment, and evidence thus obtained was admissible in a federal court.

"In this case there certainly was no interjection of an indepnedent receiving device. Even had the conversation been with this defendant, it would have been admissible against him, as the agency used in making it audible was not in violation of the Communications Act."

Judge Holtzoff of the District Court in the District of Columbia, approved of Judge Gibson's reasoning in the Yee Ping Jong case in two separate proceedings. In both instances, a Government witness listened to a telephone conversation over an extension instrument. United States v. Lewis, supra; United States v. Sullivan, 116 F Supp 480, aff'd on other grounds, 219 F2d 760. Similarly, District Judge McNamee in Ohio has held that the Communications Act does not prohibit the admission of testimony by a Federal agent as to a telephone conversation between an informer and the defendant which the agent heard over an extension instrument. In denying a motion to suppress the evidence, Judge McNamee said:

". . . In this case there was no interference with the means of communication. The conversations were heard by the officers 'at the moment' they came 'into the possession of the intended receiver.' There was no interception as that term has been defined by the Supreme Court in Goldman.

"There can be no doubt that one of the purposes of the statute is to protect the privacy of telephone conversations against interference with the means of communication. But the statute defines no duties of the communicants, each to the other, in relation to messages received by wire. Telephone conversations have not been raised to the status of privileged communications as that doctrine is recognized in the law of evidence. There is no prohibition in Section 605 against disclosure of the content or purport of a telephone message by either party to the conversation. Nor does the section proscribe the disclosure of a conversation by a third party who listened to it through the regular channels of reception with the permission of the recipient of the message.

. . . . .

"As shown by the record, the facts here present a case of eavesdropping with the permission of one of the parties to the conversation. In principle, the eavesdropping of the officers in this case is indistinguishable from the eavesdropping of the public officials in Goldman v. United States, 316 US 129, 62 S Ct 993, 86 L Ed 1322, and On Lee v. United States, 343 US 747, 72 S Ct 967, 96 L ed 1270, where it was held that the information obtained by such means was admissible in evidence. Section 605 subjects the offender to a criminal penalty and, upon well settled principles, that section ought not to be enlarged by construction to interdict procedures and practices not expressly or by clearest implication prohibited by the language employed." [United States v. Pierce, 124 F Supp 264, 269, 270.]

Two cases decided by the Court of Appeals for the District of Columbia seem to imply a construction of Section 605 contrary to that of the district courts. In James v. United States, 191 Fed 472 (1951), the accused sought to impeach a Government witness by introducing in evidence a recording of a certain telephone conversation. The witness denied that it was his voice in the recording. The trial judge excluded the evidence. On appeal, the Court of Appeals sustained the ruling. However, it went on to say (page 474):

". . . But even if it was his voice, the recording was obviously inadmissible and the court did not err in rejecting it, because Charles did not consent to the interception of the conversation and the use of the recording as evidence. 47 USCA § 605 (1946); United States v. Polakoff, 2 Cir, 1940, 112 F2d 888, 134 ALR 607; United States v. Plisco, DC DC 1938, 22 F Supp 242."

In Sullivan v. United States, supra, an informer telephoned the defendant from the Federal Bureau of Investigation office. An agent listened in on the conversation over an extension line. On the preliminary motion to suppress this evidence, Judge Holtzoff held that the procedure did not constitute an unauthorized interception. Commenting on the *James* case, he said (pages 483–484):

"The Court of Appeals for this jurisdiction has not expressly passed upon the question here involved. In James v. United States, 89 US App DC 201, 191 F2d 472, there is a remark that seems to support the defendant's contention in this case. That comment, however, was *obiter dictum* and cites the Polakoff case as an authority. It does not appear that the Court of Appeals had before it the later history of the Polakoff case. In any event, as has been frequently held both by the Supreme Court and by the Court of Appeals, a dictum should not be regarded as a ruling. The question must be deemed still open so far as the Court of Appeals for this Circuit is concerned. On the other hand, on principle as well as in the light of the state of the authorities discussed above, the conclusion seems inescapable that the Act of Congress does not apply to listening to a telephone conversation with the consent of one of the parties to it."

Later the defendant was tried and convicted. The Court of Appeals sustained the conviction. It held that the overheard conversation did not taint

the evidence actually admitted at the trial. For convenience, the Court of Appeals assumed that the defendant was the "sender" of his part of the conversation. Although not expressed in the opinion, the assumption also implies that the extension method of listening in is an unauthorized interception.

After careful consideration, we conclude that neither the James case nor the Sullivan case undertook to define the scope of Section 605. And, it is unnecessary to speculate as to what the Court of Appeals might hold when the issue is directly before it for decision. See United States v. Stephenson, supra.

The Manual for Courts-Martial, United States, 1951, provides that (paragraph 152, pages 287–288):

> "Evidence is inadmissible against the accused . . . if it was obtained under such circumstances that the provisions of Section 605 of the Communications Act of 1934 (48 Stat 1103; 47 USC 605), pertaining to the unauthorized divulgence of communications by wire or radio, would prohibit its use against the accused were he being tried in a United States district court."

As noted, there is a discernible trend of judicial acceptance of the construction of Section 605 which excludes from its operation extension telephone listening of the kind present in this case. See: United States v. Pierce, supra, page 269. Concededly, the trend cannot be equated to a well-settled rule. In our opinion, however, this interpretation of Section 605 is in substantial accord with the intention of Congress.

In enacting Section 605, Congress did not turn a telephone conversation into a privileged communication. Either party is completely free to disclose its existence and its contents to whomever he wishes, and to use it for his own benefit or the benefit of another to whatever extent he desires. See: United States v. Polakoff, supra. . Manual for Courts-Martial, supra, paragraph 152c(1), page 287. Cf. Weiss

v. United States, supra. The prohibition established by Congress is that no person shall "intercept . . . and divulge" a communication without being authorized by the sender. What meaning did Congress intend to give the word "intercept." In Goldman v. United States, the Supreme Court determined that Congress intended the word in its natural sense, that is, "the taking or seizure by the way or before arrival at the destined place." But, the court did not define the nature of the forbidden seizure. We think Congress contemplated a surreptitious taking; a seizure without the knowledge and consent of both communicants. It is that type of interception which is "inconsistent with ethical standards and destructive of personal liberty." Nardone v. United States, 302 US 379, 386, 82 L ed 314, 58 S Ct 275. And, this secret interposition of a listening device also infringes upon the "means of communication." Goldman v. United States, supra. Neither of these considerations obtains when one of the communicants authorizes a third party to listen to the conversation on an existing extension instrument. Except from the standpoint of convenience, this procedure is no different from "the overhearing of the conversation by one sitting in the same room," which the Supreme Court sanctioned in the Goldman case. Neither can it be fairly described as "dirty business."

True, there is no significant legislative history regarding Section 605. A previous enactment on the same subject, however, throws some light on Congressional intent. In the emergency created by World War I, the Government assumed control over, and operation of, the telephone and telegraph systems. Congress then became concerned about the possibility of spies tapping the telephone and telegraph lines. The Senate passed a resolution requesting the Secretary of War to report whether there were feasible devices to detect the existence of a tap on a telephone wire. The Secretary reported that neither the army nor the telephone companies knew of workable detective instruments (Sen Doc 207,

227, 65th Congress, 2d Session, 1918). Thereupon, Congress passed a law providing for imprisonment of any person, who, during the period of governmental operation, "taps" a telephone or telegraph line without authority and without the knowledge and consent of the telephone users. 40 Stat 1017.

Tapping implies an actual *cutting in* on the telephone line. We do not doubt, therefore, that the **Headnote 6** 1918 Statute was intended to prohibit the secret imposition of some instrument between the "lips of the sender and the ear of the receiver." See: Reitmeister v. Reitmeister, supra. It does not, however, suggest condemnation of the use of an extension instrument, with the permission of one of the parties to the communication. For all practical purposes, the extension listener receives the communication "at the moment, it comes into the possession of the intended receiver." Goldman v. United States, supra, page 134. The 1934 Statute uses "intercept" instead of "taps" to define the prohibited conduct. Undoubtedly "intercept" is broader in scope than "taps," but we cannot conclude that Congress intended to change the basic nature of the prohibition. It seems to us that the change was designed only to bring within the operation of the Act instruments, such as an induction coil device, which enable a person to listen to a telephone conversation without actually cutting in on the wire.

Although the number of extension telephones today is much greater than in 1934, we may take judicial notice that such instruments were ▮▮▮▮▮▮▮ in general use when Congress passed the Communications Act. It is not unreasonable to suppose that a person who employs the telephone as a means of communication impliedly consents to the receiver's use of existing extensions on his own number. Cf. United States v. Polakoff, supra; concurring opinion, Judge Clark, Reitmeister v. Reitmeister, supra. Under the circumstances, if Congress intended to prohibit an unannounced but authorized use of an extension, we should expect to find some definite expression of its will. Yet, the Communications Act gives no hint of such purpose. We are convinced, therefore, that Congress did not intend to condemn the practice. Accordingly, we hold that a person who overhears a telephone conversation by means of an extension instrument, which he is authorized to use by one of the parties to the conversation, may testify to its contents, even though the other communicant did not know of, or expressly consent to, the listening in.

At the trial, the law officer ruled that the testimony of the contents of the accused's telephone conversation with Jones was inadmissible. This ruling was erroneous. But, the board of review believed that our decision in United States v. Smith, 4 USCMA 369, 15 CMR 369, required it to adhere to the law officer's ruling. Therefore, it held that evidence of the accused's meeting with Jones was tainted by illegal evidence.

Apparently the board of review misunderstood our opinion in the *Smith* case. The question there was res judicata which has no relation to appellate review of a ruling by the law officer at the trial of the same case.

Appellate review of a trial ruling is not concerned with the effect in a subsequent trial of a final determination in an earlier and separate proceeding of an issue between the parties. In the present instance there is only a single proceeding, and a review of the admissibility of evidence in that proceeding. If the accused is acquitted, ▮▮▮▮▮ the Government, of course, cannot appeal from rulings by the law officer which erroneously exclude material evidence against him. But, if convicted, the accused is entitled to appellate review of erroneous rulings which may have prejudiced his defense. However, the accused's right is not exclusive. To support the conviction, the Government may also properly challenge erroneous rulings by the law officer. It may do so not for the purpose of obtaining consideration by the appellate tribunal of the excluded evidence, but for the purpose of showing that other evidence which has been

admitted is not illegally tainted. See United States v. Dandaneau, 5 USCMA 462, 18 CMR 86.

Of course, the law officer's ruling is not lightly to be disregarded. If it is of a factual nature and is supported by sufficient evidence it should not be set aside. United States v. Volante, 4 USCMA 689, 16 CMR 263. However, if incorrect as a matter of law, the appellate tribunal is not bound by it. Hence, the board of review misunderstood the extent of its power to review the law officer's ruling on the admissibility of the telephone conversation.

Inasmuch as we have determined that there was no illegal interception of the accused's conversation with Jones, the evidence regarding their subsequent meeting cannot be considered as "fruit of the poisoned tree." The board of review erred in concluding that this evidence was tainted.

We are satisfied that there is sufficient evidence in the record to support the findings of guilty of Specifications 1 and 2 of Charge III. Therefore, the decision of the board of review as to these charges is affirmed. The decision of the board of review as to Specifications 3 and 4 of Charge III is reversed. To the extent indicated by our opinion, each of the certified questions is answered in the negative. The case is returned to The Judge Advocate General of the Navy for action consistent with this opinion.

BROSMAN, Judge (concurring):

I agree fully with the author of the principal opinion that there was no interception here within the meaning of 47 USC § 605.

In addition—and with respect to the "fruit of the poisonous tree" contention —I certainly cannot accept the notion that a law officer's error, even one which operates to the benefit of an accused person, should be perpetuated on appeal by means of a holding that, not only shall the evidence he mistakenly excluded be not considered, but also other evidence which may in some manner be connected therewith. As a matter of fact, I am in some doubt that the linked evidence found here bore a sufficiently close relationship to that excluded to make of it any sort of arboreal "fruit"—toxic or the reverse.

LATIMER, Judge (dissenting):

I dissent.

In United States v. Noce, 5 USCMA 715, 19 CMR 11, this day decided, I set out my views on the principles ciples which I believe ought to govern our decisions in cases of intercepted communications. I deem it unnecessary to again republish those concepts. In general, I predicated my holding in that case on the provisions of the Code and the Manual which require us to follow the doctrine of the Federal civilian courts and I, therefore, look to them for precedents to govern this case.

It will be noted from the comments in the Chief Judge's opinion that the Circuit Court of Appeals for the Second Circuit in United States v. Polakoff, 112 F2d 888 (1940), held that recordings of a telephone conversation were inadmissible. The point of interception in that instance was a telephone box located in the office of one of the parties to the conversation who had consented to the arrangement. As the Chief Judge correctly points out, some doubt has been cast on the rationale of that opinion by virtue of Judge Chase's subsequent concurring remarks in Reitmeister v. Reitmeister, 162 F2d 691, 697, (CA 2d Cir 1947), in which he concludes the Supreme Court has overruled the Polakoff decision. However, his reasoning is not shared by other members of that Court as Judge Learned Hand took a contrary view and Judge Clark expressed no opinion on that phase of the controversy. In his decision, Judge Hand stated:

". . . In United States v. Polakoff, the message was taken down at the receiver's office in the same way as here, and we held that 'publishing' it was unlawful. We cannot find that the question has come up again in quite the same form, but the Supreme Court gave our decision at least a

limited recognition in Goldstein v. United States, and unless Goldman v. United States, has overruled it, we shall accept it as a valid interpretation of the section. We think that Goldman's case has not done so. The evidence in that case of what Shulman, the sender, had said over a telephone had been recorded upon a 'detectaphone' set against a wall in an adjoining room. There was no doubt that the 'detectaphone' had 'intercepted' Shulman's message as he spoke it into the receiver in the same sense that an eavesdropper would, who was hidden in a closet; but the court held that the section did not apply to such a situation. The message must be 'intercepted' by some mechanical interposition in the transmitting apparatus itself, for the message, though sent over the wire, is not immune from disclosure but only the interjection of an independent receiving device between the lips of the sender and the ear of the receiver. In the case at bar, Louis recorded the talks which passed along the transmitting wire by means of an instrument, interjected in that wire; and we cannot see why an existing lead off the main circuit was different from a 'tap' into the wire, made ad hoc." [Page 694.]

The dispute between those Judges has never been reconciled by the Supreme Court as neither case was the subject of an opinion by that Court. However, because there has been no express overruling of its holdings or reasoning, I assume they will announce the law in the Second Circuit.

There is one other Circuit which has, in a general way, pointed out the direction it intends to follow if confronted with this form of interception. In Diamond v. United States, 108 F2d 859 (1938), the Circuit Court of Appeals, Sixth Circuit, dealt with the inadmissibility of evidence obtained by wire tapping. I assume from the statement of facts that the messages were intercepted within the meaning of Section 605 of the Communications Act. The case is, therefore, only helpful insofar as it expresses one limited concept. The

**758**

principle for which I cite the case may be found in the following quotation:

"It seems to us that the privacy to be achieved by the mandate of the statute is the privacy of a conduit or instrumentality of interstate communication, though the same physical equipment may likewise be the means by which intrastate communications are made."

The Federal district courts are in disagreement on the question of whether this form of interception violates the Communications Act, and the principal opinion makes reference to and quotes from the decisions of those tribunals which have been reported. District Judges McNamee, Holtzoff, and Gibson have taken the view that the attachment of a recording device to a telephone system in the office of the receiver or listening in on an extension line is not a prohibited act. On the other hand, Judge Pine has reached a contrary conclusion. See United States v. Pierce, 124 F Supp 264 (ND Ohio 1954); United States v. Sullivan, 116 F Supp 480 (DC 1953); United States v. Yee Ping Jong, 26 F Supp 69 (WD Pa 1939); and United States v. Stephenson, 121 F Supp 274 (DC 1954).

The Circuit Court of Appeals for the District of Columbia can, at this time, be catalogued with the Federal District Courts which hold that attaching a recording instrument or listening over an extension telephone would be a violation of the Act. There is no precise holding to that effect, but the wording in James v. United States, 191 F2d 472 (CA DC Cir) (1951), so indicates. In addition, in the recent case of Sullivan v. United States, 219 F2d 760 (CA DC Cir 1955), that Court went to the extent of reasoning that information obtained by listening over an extension telephone did not taint other evidence which was obtained independent from that learned by the eavesdropper. I doubt that that rationalization would have been necessary had the Judges believed the interception legal. While I cannot prophesy what that Court's holding in a case identical to this might be, the language of the two opinions

supports a conclusion that the evidence would be inadmissible.

In summary then, I conclude that one Circuit Court of Appeals supports my views, and two have used language which indicates a possible concurrence, while quantitatively the district courts have announced a contrary view.

Because of the uncertainty existing in the pronouncements of those courts, I might join my associates in their views if it were not for the language of the Supreme Court of the United States in Goldman v. United States, 316 US 129, 86 L ed 1322, 62 S Ct 993 (1942). From the language employed and the reasoning used by Mr. Justice Roberts in his opinion in that case, which is supported by a majority of the Justices of that Court, I conclude there is a violation in this case. He finds there was no violation in that instance, but his reasoning illuminates the issue before us. He states as follows:

"The petitioners contend that a communication falls within the protection of the statute once a speaker has uttered words with the intent that they constitute a transmission of a telephone conversation. The validity of the contention must be tested by the terms of the Act fairly construed. So considered, there was neither a 'communication' nor an 'interception' within the meaning of the Act. The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation. . . .

"What is protected is the message itself throughout the course of its transmission by the instrumentality or agency of transmission." [Emphasis supplied.]

I have purposely not finished the quotation as the remaining portion will be easier to apply to the facts of this case if my interpretation is first stated. As I understand the statements which I later quote, I interpret them to say that once the message enters the system at the point of the sender, to be carried over the wires, it becomes protected from publication by third parties if heard before it leaves the agency of transmission at the usual point of exit, namely, the receiver at the ear of the listener. For purposes of illustration, I liken the message to that of water which travels through a conduit. Until the water is actually within the pipe, it may be used by anyone and when it flows therefrom, it again becomes usable. However, there is but one point of discharge and that is through the valve which is installed for that specific purpose. It cannot be used if diverted out of the pipe by new connections or channeled around the point of discharge by secondary outlets. Stated in telephonic terms, my illustration is as follows. What I shall designate as the primary circuit is between the lips of the sender and the ears of the listener. The point of entry is the mouthpiece into which the former talks, and the port of discharge is the receiver in the hands of the listener. The message may be used if it is heard before it reaches the transmitter and after it escapes through the appropriate receiver, but it remains inviolate between those points. Any contrivance which makes it possible to hear the message while still on the wires does not remove its protection from disclosure. Therefore, to seize the message between its point of entry and exit is a violation of the law, whether the seizure is by temporary attachments, by permanent extensions, or by other scientific means.

I now continue the quotation from Goldman v. United States, supra, and then measure my illustrations by its specifications:

". . . Words written by a person and intended ultimately to be carried as so written to a telegraph office do not constitute a communication within the terms of the Act until they are handed to an agent of the telegraph company. Words spoken in a room in the presence of another into a telephone receiver do not constitute a communication by wire within the meaning of the section. Letters deposited in the Post Office are protected from examination by federal statute, but it could not rightly be claimed that the office carbon of such letter, or indeed the letter itself before it has left the office of the

sender, comes within the protection of the statute. The same view of the scope of the Communications Act follows from the natural meaning of the term 'intercept.' As has rightly been held, this word indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver. The listening in the next room to the words of Shulman as he talked into the telephone receiver was no more the interception of a wire communication, within the meaning of the Act, than would have been the overhearing of the conversation by one sitting in the same room."

It is to be noted from the foregoing quotation that words written by a person are not protected by the Act because they have not entered the system. It is readily apparent that listening in a room to a conversation is not capturing words while they are being conveyed over an agency between the mouth of the speaker and the ear of a listener. Also, it would be extraordinary to hold that listening in the next room is seizing information from out of the lines of communication. In all of those situations, the listener hears only one side of the conversation and not because he has interjected himself into the conduit carrying the message but because he has obtained his knowledge before the message entered or after it was released from the area of protection. That is not so, however, when the message is obtained by affixing instruments to the lines or listening over wires which are attached but auxiliary to the primary circuit. The words are captured while still within the system, whether they are heard over a temporary or fixed attachment.

I must, of course, concede that the Supreme Court in the Goldman case, supra, suggests that there is no taking if the message is heard at the moment that it comes into possession of the intended receiver. But that statement has to be considered in its context with the other wording of the opinion, or it would legalize most taps. Certainly, if a line is tapped at the receiver's box or outside his home, the message will be heard at the same moment by the receiver and the monitor. I could well understand the cogency of that time factor if it is considered with the previous statement which mentions the receipt of the message at its "destined place," which I assume would permit no divergence to other places. If that "destined place" is not intended to be the receiver in the hands of the party listening, then any shunting of the message around the receiving party would be admissible. An interpretation which makes time the sole test would cut the heart out of the principles which have been well established by the Supreme Court, and I doubt that a majority of the Court intended that result. Therefore, the easiest way for me to vividly portray what I believe to be the rationale of the Goldman case is to suggest a conversation by two parties over a scrambled line with no devices for scrambling or unscrambling except in the one transmitting set and the one receiving set. What was audible as it was entering and hearable as it was exiting could be used. Any diversion of the scrambled message through other outlets or by other devices would be barred.

I may not have announced an approved solution, but I suggest that the one I offer meets most of the standards set by the various appellate Federal courts. If it is not appropriate, I encounter a great deal of difficulty in reconciling the cases decided by the Supreme Court. To me a recording machine affixed to the terminals in a receiving box constitutes an interception or an interference just as much as when a connection is made a few yards along the line and the conversation recorded or overheard. If one party to a conversation can authorize the affixing of a recording machine to the end of the lines on extension leads, why not at any other place on the circuit? Both seize the message. If it is permissible to have a technician run an extension off a telephone box to a room at another location, a seizure can be made legal

by the simple expedient of having an extension installed. An argument that there is a difference between a permanent and temporary installation does not solve the difficulty. If permanency is to be the touchstone, then any switchboard operator can listen or by cross-connections make it possible for a number of listeners to overhear the conversation. To avoid any or all of those possibilities, I would bar all disclosures except of conversations obtained from outside of the system. Finally, to avoid being misunderstood, I do not intend to express any opinion on the legality of the listening to, or the recording of, communications, as all that is presently before us is whether Congress has sealed the lips of the listener or a replay of the transcription if the evidence is sought to be introduced in a criminal case. I believe it has.

In conclusion, I might add that Congress and certain executive departments of the Government have considered the divulgence of information preserved by monitors, stenographic reporters, or recording instruments, without consent of both parties, as being prohibited by the Communications Act, and they have refused to sanction their use. It can be asserted that they do so out of a spirit of caution, but the fact remains that they seek to comply with the spirit of the Communications Act even though a strict interpretation might aid in netting some criminal offenders. I prefer to join with them until such time as Congress sees fit to change the law as it presently exists or the Supreme Court announces principles which conflict with my answer to this particular question.