UNITED STATES, Appellee

v.

ANTHONY J. NOCE, Private First Class,
U. S. Army, Appellant

5 USCMA 715, 19 CMR 11

716

717

LT COL George M. Thorpe, U. S. Army, and 1ST LT Albert T. Ussery, U. S. Army, for Appellant.
LT COL Charles M. Munnecke, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

This case brings up for review the applicability of the so-called wire tap provision of the Federal Communications Act, 47 USC § 605, and the admissibility of a pretrial statement allegedly obtained in violation of the accused's right against self-incrimination.

The accused was convicted by general court-martial of communicating obscene language over the telephone on two separate occasions. Substantial mitigating evidence was presented, and the court sentenced the accused to a bad-conduct discharge, total forfeitures, and confinement at hard labor for six months. The convening authority approved the sentence, but suspended the execution of the punitive discharge. A board of review affirmed.

A number of complaints about objectionable telephone calls from an anonymous caller were made to the Criminal Investigation Section of the Provost Marshal's office at Fort Richardson, Alaska. These telephone calls were received at offices and at family quarters located on the post. Lt. W. F. Beardsley, Chief of the Section, and an Agent Petersen, initiated an investigation.

With the permission of the Commanding Officer's Chief of Staff and the Post Signal Officer, arrangements were made with Mr. Ellis, technical assistant to the Post Signal Officer, to monitor certain telephones. A monitor "in effect, places an extra instrument" on the line. It can be applied only from a telephone exchange.

A special operator was assigned to monitor the entire level on which the previous calls had appeared. The operator was instructed to listen in on all calls long enough to determine whether the voice of one of the parties corresponded to the description of the voice of the person sought. After several hours, the monitor "picked up" a voice which she believed belonged to the wanted individual. She called Mr. Ellis and the telephone equipment men. The former took over the monitor, and the latter acted to prevent the closing of the electrical relay with the initiating telephone. It was determined that this telephone was located in the S–3 office of the Second Battalion, 196th Infantry Regiment, the accused's organization. The telephone called was in the family quarters area located on the post.

Lt. Beardsley was notified. In a few minutes he appeared at the telephone exchange. As he was checking the location of the suspected telephone on a map, a second call was made from it. Mr. Ellis was on the monitor. He recognized the voice. He told Lt. Beardsley, who listened on the monitor for about fifteen to twenty seconds. Lt. Beardsley then proceeded to the S-3 office. There he found the accused using a telephone. The accused was alone in the office. Lt. Beardsley directed him not to "hang up," but the accused put down the telephone. However, the connection was not broken. Lt. Beardsley established contact with Mr. Ellis and ordered the accused to repeat certain words over the telephone to him. These words had been overheard by Lt. Beardsley when he listened on the monitor. Mr. Ellis informed Lt. Beardsley that the accused's voice was the same as the voice he had heard in the monitored conversations.

The accused was taken to the Criminal Investigation Detachment office.

En route, Lt. Beardsley told him that he had previously overheard the accused use the words employed in the test, and the accused was "caught in the act." He was not, however, asked to make a statement. Arriving at the office, the accused was brought to a room which contained a concealed microphone. He was advised of his rights under Article 31, Uniform Code of Military Justice, 50 USC § 602, and interrogated. Although unknown by the accused, the interrogation was recorded on tape. A week later, the accused was again interrogated in the same room. Before the questioning, he was warned of his rights. This conversation was also secretly recorded. A third interrogation was conducted three days later. Once more, the accused was fully advised of this rights, and once more the interrogation was recorded. Over defense objection, a part of the last recording was admitted in evidence as a sample of the accused's voice. Also admitted was a written statement containing the substance of a number of the accused's answers to questions put to him during the interrogation. The statement is prefaced by a recital of the accused's rights under Article 31. Both the prefatory and main statements are signed by the accused. At the trial, on separate playbacks of the recording, each of the female complainants identified the accused's voice as that of the anonymous person who called her.

Material and relevant matter is admissible in evidence unless a recognized rule of law requires its exclusion. The accused contends that the wire tap provision of the Federal Communications Act bars the admission of evidence of the discovery of his identity as the user of the telephone in the S–3 office. In pertinent part, the Act reads as follows:

"§ 605. Unauthorized publication or use of communications.

". . . no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. . ."

The Manual for Courts-Martial, United States, 1951, expressly recognizes that evidence which is inadmissible in a Federal district court because obtained in violation of the Communications Act is also inadmissible in a court-martial. Paragraph 152, pages 287–288.

Wire tapping has occupied the attention of Congress, the courts, the legal profession, and the public for many years. As is common with subjects of so personal a nature, opinions on the ethics of wire tapping are both numerous and controversial. Cf. Hearings before Subcommittee No. 2 of the Committee on the Judiciary on H. J. Res. 283, 77th Congress, 2d Session, 1942, page 21, and Dissent of Judge Brandeis in Olmstead v. United States, 277 US 438, 479, 72 L ed 944, 48 S Ct 564. The occasion for a wire tap frequently colors the shade of opinion as to its rightness. But, personal opinion of the morality of the practice cannot substitute for legal principle. We must, therefore, determine the limits of the law.

Almost thirty years ago, the United States Supreme Court held that the admission in evidence of conversations of the defendant obtained by tapping business and home telephones did not violate the United States Constitution. Olmstead v. United States, 277 US 438, 72 L ed 944, 48 S Ct 564. The constitutional holding was reaffirmed in Nardone v. United States, 302 US 379, 82 L ed 314, 58 S Ct 275. However, in that case the Supreme Court also determined that, in enacting Section 605 of the Communications Act, Congress intended to establish a rule of evidence for the Federal courts. It held that the rule prohibits the admission of evidence obtained as a result of tapping interstate telephone calls. Later, in Weiss v. United States, 308 US 321, 84 L ed 298, 60 S Ct 269, the Supreme Court concluded that the inclusive language of the statute prohibits the interception and divulgence of intrastate communications, as well as those of an interstate character. See also: Nardone v. United States, 308 US 338, 84 L ed 307, 60 S Ct 266.

It has been said that in Goldstein v.

**Headnote 1**

United States, 316 US 114, 86 L ed 1312, 62 S Ct 1000, and Goldman v. United States, 316 US 129, 86 L ed 1322, 62 S Ct 993, the Supreme Court veered sharply away from the rationale of *Nardone* and *Weiss*. See: Westin, The Wire Tapping Problem, 52 Col L R 165, 178–181 (1952). We need not consider the merits of this contention. This much is clear—the Supreme Court has consistently held that the use of wire tap evidence in a criminal case is not prohibited by the Constitution of the United States; it is inadmissible in a Federal court solely because of the rule of evidence prescribed in Section 605 of the Communications Act. See: On Lee v. United States, 343 US 747, 96 L ed 1270, 72 S Ct 967; Schwartz v. Texas, 344 US 199, 97 L ed 231, 73 S Ct 232. The question then is whether the exclusionary rule applies to the kind of communication present in this case.

In the first *Nardone* case, the Supreme Court construed Section 605 as intended to protect "against practices and procedures violative of privacy." 302 US 379, page 383, 82 L ed 314, 58 S Ct 275. But, in Goldman v. United States, supra, page 133, the Court described the purpose of the statute as follows: "The protection intended and afforded by the statute is of the means of communication and not of the secrecy of the conversation." Whether these purposes are mutually exclusive, or merely additive, is immaterial to this case. The fundamental question is whether the communication here is within the limits of the rule of evidence established by Congress.

Congressional committee reports indicate that the major purpose of the Communications Act is to ▮▮▮▮▮▮ ▮ regulate interstate and foreign commerce. No legislative history of any consequence regarding Section 605 itself is available. Nardone v. United States, supra, pages 382–383. However, in the Weiss case, the Supreme Court concluded that the "difference in the wording of the various clauses of § 605" discloses a Congressional intent to exclude evidence obtained by intercepting intrastate as well as interstate communications. See also: Sablowsky v. United States, 101

F 2d 183 (CA 3d Cir 1938). Does this difference also compel the conclusion that the prohibition extends to conversations over a self-contained, exclusively controlled, operated, and maintained military communication system? We conclude that it does not.

Section 605 prohibits the interception and divulgence of "any communication." These words, however, must be read in the context of the Congressional objective. Thus, in Casey v United States, 191 F 2d 1 (CA 9th Cir 1951) (reversed 343 US 808, 96 L ed 1317, 72 S Ct 999, on confession of error by Government counsel regarding another matter), the Court of Appeals held that the statute did not protect communications over a private, unlicensed system. There, the defendants used a radio transmitter as part of a scheme to defraud horse race bookies. Under the plan, one of the defendants by telephone obtained the name of a winning horse direct from the race track. The information was transmitted by radio to a confederate stationed near the bookie's place of business. A third operator was also stationed at the receiving end. As soon as the information was received, he entered the betting establishment and placed a bet on the horse which had already won. The location of the transmitter was changed from day to day. Ultimately, investigators, using mobile directional equipment, located it in a hotel. The defendants were apprehended. Two bags, containing radio equipment, were taken from their automobile, which was parked in a public garage adjoining the hotel. Among the errors asserted on appeal, the defendants maintained that the trial court erred in admitting into evidence testimony of their intercepted broadcasts. Rejecting the argument, the Court of Appeals, in a unanimous opinion, said (page 4):

"There is no merit to appellants' contention that the trial court erred in admitting in evidence the substance of radio messages between appellants. § 605 of the Act, 47 U.S.C.A. 605, which prohibits the interception and divulgence of communications without the consent or approval of the sender, refers to com-

munications over licensed facilities. The appellants were unlicensed operators transmitting voice messages over an unlicensed station, without call letters, on a portion of the band reserved for Morse Code operations. The protections of the Act were never intended for, nor do they cover, such communications which are themselves illegal." [Casey v. United States, supra.]

More recently, the United States Supreme Court has implied that not every system of communications is within the ambit of Section 605. In On Lee v. United States, supra, Chin Poy, an old acquaintaince of the defendant, but at the time acting as a Government informer, entered On Lee's laundry. Chin Poy was "wired for sound." A small radio transmitter was hidden inside his coat. A Federal agent was stationed outside the laundry, with a receiver tuned to the transmitter. The defendant's conversation with Chin Poy was overheard by the agent. At the trial, he was permitted to testify to incriminating admissions made by On Lee in his talk with Chin Poy. The defendant contended that this testimony was inadmissible under the wire tap rule. In rejecting the contention, the Supreme Court said (page 754):

". . . There was no interference with any communications facility which he possessed or was entitled to use. He was not sending messages to anybody or using a system of communications within the Act. Goldstein v. United States, 316 US 114, 62 S Ct 1000, 86 L ed 1312."

We are of the opinion that a self-contained military communications system is not the kind of system intended by Congress to be included under the provisions of Section 605. Although a particular subject may affect both the civilian and military communities, basic differences between the two frequently require and legally justify a difference in treatment. See: United States v. Voorhees, 4 USCMA 509, 531, 545, 16 CMR 83. It requires no elaborate recitation of reasons to emphasize the need in the military establishment for close supervision and control over its own communication systems. Monitoring of

some sort is essential to protect the armed forces from unauthorized disclosure of military secrets or just "loose talk" about confidential military matters. Such disclosures may be made over a so-called private line on a military post as well as over official lines. This was undoubtedly appreciated by Congress. And, it seems to us that Congress would not restrict the power of the military establishment without a specific declaration to that effect. Accordingly, we hold that Section 605 does not apply to a communication confined to a military telephone system.

The evidence establishes that the monitored call originated from a telephone on the post, and was received on the post. The telephone system at Fort Richardson comprises three "levels" of telephones, Victor, Taylor, and Temple. The Temple level, which was used by the accused, is dial operated; and since the central switchboard of the post is described as "all-relay" kind, it may be inferred that the others are similarly operated. When a call is made it appears at the central switchboard in the form of a light, but, apparently an operator is not required to complete calls within a level, or from one level to another. The entire system is controlled, maintained, and operated by the Army.

The record is silent as to the method of completing calls between on-post and off-post telephones. We may assume that, when required, a telephone in the post system may be connected to one in regular commercial channels. However, we cannot take judicial notice of the fact that the two systems are so integrated as to constitute a single, inseparable entity. Cf. Weiss v. United States, supra. If anything, it is a matter of general knowledge in the military establishment that a call to an off-post number cannot be made from a post telephone without first effecting a trunk connection through an operator or an electrical relay circuit. This circumstance indicates general separability of the two systems. As far as the evidence indicates, therefore, the call in issue was acomplished exclusively over a military system. Monitoring such a telephone call is not prohibited by the

Communications Act. And, as previously pointed out, the Supreme Court has held that the use of such evidence at a trial is not prohibited by the Constitution. Olmstead v. United States supra. Consequently, there was no error in the admission of the evidence obtained by monitoring the call which led to the accused's apprehension.

We turn now to the admissibility of the accused's pretrial statement and the recording of his voice. ■ Since the evidence procured by monitoring the accused's telephone call is itself admissible, additional evidence obtained from leads provided by that communication is also admissible. Cf. Sullivan v. United States, 219 F 2d 760 (CA DC Cir 1955). See: United States v. Dandaneau, 5 USCMA 462, 18 CMR 86. Hence, in the absence of other disqualifying circumstances, there can be no dispute as to the admissibility of the accused's written statement and the tape recording of his voice. See: Goldman v. United States, supra. However, the accused argues that, apart from interception of his call, he was compelled to incriminate himself when he was required to speak over the telephone.

In United States v. Greer, 3 USCMA 576, 13 CMR 132, we held that to compel an accused to submit to a ■ voice identification test is a violation of the privilege against self-incrimination. Indisputably, therefore, Lt. Beardsley deprived the accused of a right when he ordered him to speak over the telephone. Had evidence of this test been offered by the prosecution it would have been inadmissible. However, such evidence was not presented. Instead the prosecution presented the subsequent tape recording and the written statement. Both of these indicate that the accused was fully advised of his rights under Article 31 prior to their making. The question then is whether they are inadmissible because tainted by the earlier voice identification test. The accused contends that the improper test "let the cat out of the bag." United States v. Bayer, 331 US 532, 540, 91 L ed 1654, 67 S Ct 1394.

**722**

An incriminating statement improperly obtained from an accused does not stand as a perpetual bar to the admission of later inculpatory statements. Removal of the improper conditions which produced the initial admission of guilt will permit the use of subsequent statements, if they are otherwise properly procured. United States v. Bayer, supra. Determination of the continuing influence of the pernicious circumstances producing the first statement is "one of fact." United States v. Monge, 1 USCMA 95, 99, 2 CMR 1. Here, the accused was not informed of the result of Lt. Beardsley's test. However, assuming that he believed he was identified as the anonymous caller, there is ample evidence which indicates that the influence of this knowledge was fully dissipated by the time he made the third recording and signed the statement admitted in evidence.

Ten days elapsed between the voice test and the statement and recording. On three separate occasions during that period, the accused was fully informed of his right not to make any statement. Yet, he freely answered all questions put to him, and voluntarily signed the written statement. The subject matter of the three interrogations varied. It clearly appears from the following excerpt of the recording that the accused was not at a "psychological disadvantage" because of the earlier voice tests. Cf: Dissenting opinion of Judge Latimer, United States v. DeLeo, 5 USCMA 148, 177, 17 CMR 148; Dissenting Opinion of Judge Brosman, United States v. Dandaneau, supra.

"(Agent Petersen): 'That makes three calls you remember then. You remember speaking to the babysitter, you remember talking about the book, "From Here to Eternity," and you remember talking to the Special Service girl, is that right?'

"(PFC Noce): 'And one other—the one I called back.'

"(Agent Petersen): 'Mrs. W...?'

"(PFC Noce): 'The one I called back.'

"(Agent Petersen): 'You don't remember saying anything like, "This is Sergeant P...?"'"

"(PFC Noce): 'I don't remember that. If they said I said it, I'll admit I said it.'

"(Agent Petersen): 'Oh now, Tony . . . .'

"(PFC Noce): 'Because I must have said it if they heard me say it.'

"(Agent Petersen): 'Here's the way I feel about it. If you don't remember saying it, I don't want it.'"

Plainly, the interrogations were separate and unrelated to the voice test and did not constitute parts of "one continuous process." Cf: Leyra v. Denno, 347 US 556, 561, 98 L ed 948, 74 S Ct 716. They are not, therefore, as a matter of law, tainted by Lt. Beardsley's improper voice test. This is also true of the written statement signed by the accused. Consequently, the law officer did not abuse his discretion in admitting in evidence the tape recording and the accused's pretrial statements. The decision of the board of review is affirmed.

BROSMAN, Judge (concurring):

I am perfectly willing to accept the notion that Section 605 has no application to a self-contained military switchboard.

II

For a long time it has seemed to me that there is a substantial component of Alice-in-Wonderland in █ certain of the decisions interpreting this Section. This aura of unreality, a faintly disembodied air—occasionally found as well in other difficult juristic situations —is doubtless the product of unlikelihood that the Congress, in adopting the Communications Act, gave much, if any, thought to the problem of wire tapping. At least, this has always been an article of my faith—and it has nothing at all to do with what the law of the problem *should be.*

Against this backdrop of fantasy in the interpretation of Section 605, I have little reluctance to accept the Chief Judge's view that Congress meant to exclude military communications systems from the proscription against wire tapping by law enforcement agencies. In my view, Congress purposed that ex-

ception fully as much as it intended the ban itself. However, in more specific support of the rationale of the principal opinion, I observe that special safeguards are supplied in the Criminal Code for communication lines, stations, or systems "operated or controlled by the United States." 18 USC § 1362. Since military communications fall safely within this individualized coverage, it can be argued more cogently, I think, that the legislature intended to permit measures—including even wire tapping perhaps—which are necessary to maintain these communications in proper functioning condition.

It is undeniable that rights more fundamental than any against wire tapping have given way to public necessity. For instance, the privilege against self-incrimination—which certainly exists as to private papers—cannot be maintained in full degree as to "records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." See, e.g., Shapiro v. United States, 335 US 1. Similarly, the public interest in some sorts of records and documents may lead to a relaxation of the normal restraints against intrusions on one's privacy through searches and seizures by Federal agents. Davis v. United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256. It is strange then to suppose that Congress granted the users of communication facilities operated by military authorities less freedom from telephone conversation monitoring than might be possessed by the subscriber to private facilities? How, in fact, without an exception of this nature, could the Government possibly see to it that its telephone facilities were not used for unauthorized—even dangerous— purposes, rather than for official ones?

III

Other interesting facets to the case are recognizable. For example, Section 605 of the Communications Act provides that no unauthorized person shall "intercept any communication *and* divulge or publish the existence, con-

**723**

tents, substance, purport, effect, or meaning of such intercepted communication to any person." (Emphasis supplied.) The Department of Justice has long taken the position, I believe, that a violation of the Act requires more than interception alone. Of course, the conjunctive phrasing used supports this view. See Coplon v. United States, 191 F2d 749, 759 (CA DC Cir). So, too, do judicial interpretations of other Federal offenses—such as misprision of felony—which are defined conjunctively. See 18 USC § 4.

To be sure, what shall be deemed to constitute "divulgence" is not overly clear. Would it suffice that a wire tapper repeated to an associate the contents of a message, or included it within a report to his official superiors within the investigative agency involved? These questions I need not resolve, but it seems doubtful to me that the record of trial here reveals a divulgence of even the "existence" of any sort of communication made by the accused—that is, one within the meaning of the Communications Act's phrasing. Instead, there was here no more than an attempt— happily a successful one—by communications personnel to recognize a voice, and thereby to identify the telephone extension from which the obscene calls involved had emanated. These communications people declined consistently to relate the contents of that which had been said by the accused during his calls—with, apparently, a specific purpose to avoid *divulgence* of the monitored communications. Granting arguendo that 47 USC § 605 is applicable to a military switchboard, I am in some doubt that the present case reveals a violation of that legislation.

### IV

Another thing puzzles me mildly. Obscene language is not, I think, deemed entitled to the free speech protection of the First Amendment. It is, indeed, a subject of express prohibition in Chapter 71 of the Criminal Code. See 18 USC §§ 1461–64. Moreover, it would seem that the persons toward whom obscenities are directed through the medium of a telephone exchange are entitled to protection therefrom.

Presumably the Congress did not intend to sacrifice their interests to a desire for privacy on the part of the promulgator of obscenity. Yet if telephone officials are not to be permitted— as in the present case—to monitor their own circuits in some manner or other for the purpose of determining the origin of objectionable calls, I can conceive of no genuinely effective means by which the commission of this type of offense can be curtailed.

Indeed, this circumstance appeared to carry great weight at once with the law officer, the staff judge advocate, and the board of review—and I think properly so. They refused—without the most unmistakable mandate from Congress—to invalidate a measure regarded as necessary to escape a distinct burden on telephonic communications. The board of review noted that, "To hold otherwise would, in a similar but more serious setting, permit a person to terrorize a whole community with threats of violence or even death and remain beyond the reaches of the law to carry out his threats, or some of them, with only a remote possibility of detection." It is familiar knowledge that scurrilous anonymous calls are frequently a nuisance today—especially those directed to persons of prominence or to ones who take controversial or unpopular positions. To say that Congress wished to prevent communications authorities and police officials from dealing with this public annoyance—perhaps menace—in the only feasible way is to impute to its members an intention which is scarcely probable.

Thus the necessities of the situation may serve to convince doubters that the result reached here by the Chief Judge is appropriate—regardless of whether his rationale be accepted.

LATIMER, Judge (dissenting):

I dissent.

### I

One need only keep abreast of recently decided cases, newscasts, editorials and Congressional hearings to know and understand that the law on wire tapping has resulted in a climate of uncertainty and dissatisfaction. Debates and dis-

putes have involved conflicting views on the desirability of granting law enforcement agencies the authority to listen in on telephonic conversations as measured against the necessity for preserving the liberty of the individual. The judges of trial and appellate courts are poles apart on whether it is "dirty business" or whether it is a means which must be tolerated to permit the Government to prosecute adequately those who commit serious crimes. According to the Report on Hearings before Subcommittee 3, Committee on the Judiciary, House of Representatives, First Session of the 83d Congress, bills have been presented in every session of Congress since 1940 seeking to authorize wire tapping for purposes of national security, provided there are essential safeguards written into the law. Out of the welter of decided cases, Congressional hearings, and public statements by responsible Government officials, there has come one concept which I believe is expressed clearly and definitely by all. That is, the interception of a telephone communication is presently illegal and it should not be sanctioned in the future except in the most serious cases and then only after the particular interference has been authorized by the Attorney General of the United States, by a Judge of a Federal court, or by the Secretaries of the Departments of the Army, Navy, and Air Force. While there is a natural tendency to get into the act, I need not express my personal views with regard to the wisdom of previous enactments or the merits of any contemplated legislation. The only task that presently faces me is to decide properly each case that reaches this Court in accordance with the principles of military law as announced in the Code and the Manual.

## II

Article 36 of the Uniform Code of Military Justice, 50 USC § 611, is my starting point. It provides as follows:

"(a) The procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals may be prescribed by the President by regulations which shall, so far as he deems practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which shall not be contrary to or inconsistent with this code."

I do not believe it necessary to quote authorities to the effect that such a broad grant of power authorizes the President to prescribe principles governing the admission into evidence of testimony obtained by wire tapping or other closely allied means. Specifically, the Article states that so far as the President deems practicable, the rules of evidence generally recognized in the trial of criminal cases in the United States district courts shall be adopted. That authorization controls the principal issue in this case.

Article 36 of the Code is amplified in crystal-clear language by paragraph 152 of the Manual for Courts-Martial, United States, 1951. Relevant to the issue before us, it is as follows:

"Evidence is inadmissible against the accused if it was obtained as a result of an unlawful search of his property conducted or instigated by persons acting under authority of the United States, or if it was obtained under such circumstances that the provisions of Section 605 of the Communications Act of 1934 (48 Stat. 1103; 47 U. S. C. 605), pertaining to the unauthorized divulgence of communications by wire or radio, would prohibit its use against the accused were he being tried in a United States district court. All evidence obtained through information supplied by such illegally obtained evidence is likewise inadmissible."

Up to this point, I encounter no difficulty and I daresay the task of applying the law would indeed be simple if there was uniformity in the holdings of the various District Courts or if the United States Supreme Court had proclaimed principles which would govern the issues in the case before us. Unfortunately, such is not the case and much genuine doubt exists as to the admissibility of testimony obtained by

various methods of listening in on telephone conversations. It may well be that I will import into military law some of the unclear concepts presently plaguing civilian courts, but at least I have attempted to find standards erected by them by which my views can be measured.

## III

It is, as the Chief Judge states, quite certain that a conviction based on evidence obtained by wire tapping does not contravene the Fourth or Fifth Amendments to the Constitution of the United States. That was so held in Olmstead v. United States, 277 US 438, 72 L ed 944, 48 S Ct 564, and the rationale of that case has not been rejected in subsequent decisions. However, that opinion was by a closely divided court, and the Justices of the Supreme Court expressed divergent views on the constitutional issue. Thereafter, in 1934, Congress amended the Communications Act, 48 Stat 1103, 47 USC 605, and in subsequent cases the Supreme Court interdicted the admissibility of wire tap evidence by holding that the provisions of Section 605 of that Act compelled such a construction. Prior to Nardone v. United States, 302 US 379, 82 L ed 314, 58 S Ct 275, there was serious doubt as to whether the Act was intended to control the admissibility of evidence in Federal courts, but in that case the Supreme Court laid all uncertainty to rest although the decision posed other complicated and difficult questions. In Olmstead v. United States, supra, and other cases which have been decided by the Supreme Court since that time, there are expressions by individual justices about the future destruction of the right of privacy, particularly because of the progress in scientific methods of intercepting telephone conversations. It is only because of the judicial construction of the Communications Act by that Court that any semblance of the right has been retained.

## IV

There are certain principles which have been fixed by the Supreme Court and I can enumerate them in short order. First, it is now certain that evidence obtained by the use of microphones or microphones implemented by amplifying devices, absent trespass, is admissible in evidence. The Supreme Court has held without equivocation that evidence obtained in that manner does not violate the Constitution of the United States or the provisions of the Communications Act, Olmstead v. United States, supra.

The second principle now firmly imbedded in the law covers evidence which is obtained through the use of instruments attached to the lines of communication for the interception of messages being carried over the lines, unbeknownst to either party. That is the means most generally understood to be encompassed within the term interception. When that method is used and the connection is between the lips of the sender and the ears of the receiver, the evidence is inadmissible.

Having fixed the two rules which are free from doubt we are left in a sea of uncertainty as to other controlling principles. By way of illustration, the Supreme Court has not spoken on the admissibility of a conversation recorded on a recording instrument at either terminus; that overheard on a party line; that heard by a third party listening on an extension of the telephone called; that taken down by a secretary in the office of either the sender or receiver; or that obtained by a third party who can hear the conversation through the receiving set of the listener. I mention those situations because one is presently facing us and others may find their way to this Court before Congress enacts additional legislation. However, to remain on as firm a ground as possible, I shall deal with the cases now under consideration on an ad hoc basis.

## V

In the light of the facts of this case, I am convinced that the prevailing doctrine in the lower Federal Courts and the Supreme Court requires that we hold the questioned testimony incompetent

and inadmissible. It matters little that this telephone system was controlled and operated by the military services within a Federal reservation in Alaska. Federal law applies there just as well as any other place. 37 Stat 512, 48 USC § 23, provides:

"The Constitution of the United States, and all the laws thereof which are not locally inapplicable, shall have the same force and effect within the said Territory as elsewhere in the United States. All the laws of the United States passed prior to August 24, 1912, establishing the executive and judicial departments in Alaska shall continue in full force and effect until amended or repealed by Act of Congress; except as herein provided all laws in force in Alaska prior to that date shall continue in full force and effect until altered, amended, or repealed by Congress or by the legislature. (Aug. 24, 1912, ch. 387, § 3, 37 Stat. 512.)"

While the opinion of the Chief Judge holds that the Communications Act does not apply to this type of installation, I support my conclusion to the contrary by referring to the facts and applying the law as I understand it. The record does not disclose the ownership of this particular telephone communication system and I find nothing in the record to indicate that it was wholly owned by the Government. I do, however, consider it fair to assume from the record that it was operated in connection with a normal civilian telephone system. There were some three thousand telephone outlets on the Post which were used by both military and civilian personnel and reference is made in the briefs to long distance calls to the United States. One of the supervisors of the system who was consulted in regard to the interception was a civilian. Furthermore, the accused called to the home of a noncommissioned officer of the United States Army and talked with a baby sitter who was there employed. In most instances, telephones running to the homes of military personnel on military reservations are not limited to intrareservation communications and generally post systems tie in with lines operated and maintained by civilian communication companies which carry interstate messages. There is no testimony which shows to the contrary, and I have no reason to believe this system was a disconnected installation on a post, isolated from Alaskan and Continental United States telephone traffic.

Departing from that view and assuming, arguendo, that this system was wholly owned by the Government and operated independently of any civilian system, I must confess that I regard that fact as immaterial. The act does not provide for any exemption and there is nothing in the legislative history of the present Communications Act to lead me to believe that Congress contemplated any sort of exemption from the effect of the Act for normal interconnected post installations. Certainly, the services themselves have never understood that any such exception existed. Representatives from each Department appeared before Congress during the course of the 1953 Judiciary Subcommittee hearings referred to earlier, and pressed for an exception from the general wire tapping ban to the extent that in cases involving the most serious offenses the Secretary of each Department be empowered to authorize a wire tap. In the absence of any indication in the present Communications Act itself, in the Congressional Hearings, or in pre-existing case law, I conclude that the exception carved out by the majority opinion is based upon a mistaken belief that the exigencies of the services require that we exempt them from the Act. That, however, is a matter for Congressional and Executive consideration as the law at the present time not only does not exclude them, it specifically includes them.

While under different conditions there might be some valid basis for exempting telephone lines used solely for military administrative or tactical purposes from the operation of the Act, the facts of this case establish that normal usage of the lines included purely social conversations with people who were not members of the armed forces. Numerous Federal cases have held that the Communications Act applies to intrastate communications, and if the Federal government has covered that type

727

of service, a telephone system on a military post which serves homes, quarters, and other installations should not be open territory for the eavesdropper or the crime detector. Especially is that true in an area where the Federal government has exclusive control over those who operate therein.

To adopt the view of the Chief Judge would bring about this undesirable result. A person talking from the United States would be protected by the Communications Act, but the one speaking from within the reservation would be at the mercy of those who desire to listen. Neither logic nor reason demands that Federal courts so restrict the right of privacy of members of the Armed Forces when they are living under conditions equivalent to those of the civilian population. And we should not be less generous.

## VI

In the case at bar, the evidence was obtained by monitoring the telephone lines at the central exchange, and the statements were heard over a loudspeaker system in the office of the camp signal officer. There can be little question but that the means employed was a classic intercept deliberately conceived for the purpose of trapping the alleged offender. That such is the case may be gleaned from the facts in the record and the law announced in the quotations I hereinafter set out.

Starting with the Supreme Court, I find that in Goldman v. United States, 316 US 129, 86 L ed 1322, 62 S Ct 993, Mr. Justice Roberts, speaking for the Court had this to say:

". . . The same view of the scope of the Communications Act follows from the natural meaning of the term 'intercept.' As has rightly been held, this word indicates the taking or seizure by the way or before arrival at the destined place. It does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver. The listening in the next room to the words of Shulman as he talked into the telephone receiver was no more the interception of a wire communication, within the meaning of the Act, than would have been the overhearing of the conversation by one sitting in the same room."

The Circuit Court of Appeals for the Second Circuit in United States v. Polakoff, 112 F2d 888, held that affixing a recording instrument to an extension of the telephone circuit was an interception. Judge Learned Hand, speaking for that Court, stated:

"Moreover, the recording was an 'interception'. It is true that in the three decisions in which the Supreme Court has interpreted § 605, Title 47 U. S. Code, 47 USCA § 605, the prosecuting agents had physically interposed some mechanism in the circuit as it had been constructed for normal use; at least this is what we understand by a 'tap'. That was not the case here; the recording machine was merely fixed to an existing 'extension' of the familiar kind in an adjoining room. We assume that the situation would have been no different, had the agent merely listened at the extension, and taken down what he heard by shorthand. The statute does not speak of physical interruptions of the circuit, or of 'taps'; it speaks of 'interceptions' and anyone intercepts a message to whose intervention as a listener the communicants do not consent; the means he employs can have no importance; it is the breach of privacy that counts."

Judge Clark, the dissenting judge in the Polakoff case, did not question the inadmissibility of testimony obtained by attaching an electrical or mechanical contrivance to a system at a point between the receiver and sender. He reasoned as follows:

". . . The governing statute, 47 USCA § 605, provides that no person not being authorized by the sender shall intercept any communication by wire and divulge or publish its existence or contents. As pointed out in United States v. Yee

728

Ping Jong, DCWD Pa, 26 F Supp 69, the verb 'intercept' means 'to take or seize by the way, or before arrival at the destined place' (Webster's New International Dictionary, 2d Ed), and does not aptly refer to a communication which has reached its intended destination and is recorded at one end of the line by one of the participants or, it should be added, by his direction. Reasons of policy justify the making of telephonic communications privileged for the two parties involved; they do not justify making them so privileged to one party as against use by the other."

The Federal District Courts which have considered the problem have been uniform in their holdings on this principle. In United States v. Sullivan, 116 F Supp 480, Judge Holtzoff stated his views of the law in the following language:

". . . It is obvious from the phraseology of the statute that it was aimed at actions of two types: first, it sought to prohibit a telephone switchboard operator from divulging any conversation that may be overheard, or telegraph or radio operator from disclosing the contents of a telegram or radiogram; and second, it sought to preclude any unauthorized person from surreptitiously ataching some mechanical apparatus to a telephone or telegraph wire and thereby listening to or otherwise intercepting communications passing over the wire, without the knowledge of the parties to the conversation or message as the case may be."

District Judge Pine, in United States v. Stephenson, 121 F Supp 274, reached a result contrary to that arrived at by Judge Holtzoff in the Sullivan case, but stated the principle in the following language:

"The second issue is whether the conduct of Parsons constituted an interception within the meaning of the statute. There is nothing in the Communications Act, supra, indicating that Congress intended a meaning other than its ordinary meaning. Accepting its ordinary meaning, I have no difficulty in reaching the conclusion that the acts of Parsons above set forth constituted an interception. Webster's New International Dictionary gives this definition to intercept, namely, 'to take or seize by the way, or before arrival at the destined place.' Both in space and time, the taking in this instance was before the arrival of the communications at the destined place. I am therefore of the view that the acts of Parsons above set forth constituted an interception within the meaning of the statute."

Because of the unanimity of the Federal courts on this principle, I find no difficulty in holding that the means employed in this instance amount to an interception within the meaning of the Communications Act.

VII

The assertion that accused cannot complain because he was using a telephone on a military reservation needs but little development. The cases which most nearly touch on that rule involve the defendant, Judith Coplon. In those cases the residential and office telephones of the defendant, who was employed by the United States Department of Justice, were tapped. The decision of the District Court, 88 F Supp 921, and the holding of the Circuit Court of Appeals for the Second District, 185 F2d 629, specifically mentioned all of the individual taps made to assist in defendant Coplon's detection, apprehension, and trial. By failing to give them separate treatment the courts inferentially overruled the prosecution's contention that she could not rely on the office interceptions as being violative of the law. In those instances the interferences were specifically authorized by the Attorney General of the United States who was head of her Department and yet they were held to be illegal. Pretermitting any question of confidentiality, I find many good reasons why my telephone communications should not be intercepted and the information broadcast merely because the system

is used and can be tapped within a building owned and operated by the United States Government. Certainly, Federal officials should be free to transact business over the telephone without some busybody listening in. Moreover, when Congress enacts a prohibition against interfering with and disclosing the contents of communications the privilege should not be chiseled away by exempting those agencies who ought to be the first to comply.

## VIII

The next point of dispute brings me to the argument that this intercept was not a violation of Section 605 of the Communications Act because it was authorized by a party to the conversation. In the light of this record, a discussion of that contention seems unnecessary. Section 605 of the Communications Act of 1934, 48 Stat 1103, 47 USC § 605, provides in pertinent part as follows:

". . . no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. . . ."

It can hardly be asserted with any degree of conviction that the wire tapping or the divulgence of this communication was authorized by the accused for I find in the record a stipulation to this effect:

". . . that the accused had no knowledge of, and did not consent to, any interception or divulging of any telephone calls he may have made during the month of January 1954."

This case does not require a finding as to who was the sender as neither party knew of the interception until after the agents for the Government had published the message, apprehended the accused, and confronted him with their knowledge of the statements he had made over the telephone wires. He thereafter orally confessed. Most assuredly Mrs. W. did not authorize the agents of the Government to intercept the message as its contents had been divulged and used before she

**730**

was cognizant of the fact that third parties were monitoring the lines of communication. It cannot, therefore, be held that the Government agents were authorized by either party to seize and use the message as a base for their detection of the accused.

## IX

The third and last point of importance has two facets. The first involves the question of whether there was a divulgence of the message within the meaning of the Communications Act. The second poses the problem of whether the wrongs of the Government agents in intercepting the call prohibit the use of any subsequently acquired information resulting from the intercept. I believe both facets have been the subject of rulings by the Federal courts and both uses have been prohibited. Again I follow the principles enunciated by them.

When the first Nardone case was reversed, the case was again tried before a jury and it reached the Circuit Court of Appeals, Second Circuit, for the second time. In the second trial before the trial court, evidence obtained by use of the taps was not admitted. The question raised on appeal was the effect of the unlawful taps. Judge Learned Hand, in speaking for that Circuit Court of Appeals, 106 F2d 41, announced the following test:

"There is left only the question of the effect of the unlawful 'taps'. Did they taint all other evidence procured through them? Watson v. United States, 3 Cir, 6 F2d 870. Did the burden rest upon the accused or the prosecution, to show to what the taint extended? United States v. Kraus, D.C., 270 F 578, 581. How should the inquiry be conducted? Was it too late to leave it until the trial? We do not think we need answer these questions because of the decision in Olmstead v. United States, 277 US 438, 48 S Ct 564, 72 L Ed 944, 66 ALR 376, which, so far as we can see, still stands. The doctrine of that case is that telephone tapping is not of itself

an unlawful search under the Fourth Amendment. If it were, then perhaps not only the actual talk overheard would be incompetent, but any evidence obtained by means of it; the court did not say as to that. In any case the same consequence does not attend the acquisition of evidence by means of an ordinary crime; as to that, the common-law still prevails, and the court will not look beyond the character of the evidence itself. In Nardone v. United States, supra, 302 US 379, 58 S Ct 275, 82 L Ed 314, the Supreme Court decided only that the Federal Communications Act, 47 USCA § 151 et seq., forbad divulging information derived from telephone 'taps' in a court of law by government employees; all the discussion ranged upon whether the language of the act covered them. If it did, their testimony had been forbidden, and was of course incompetent; Congress had made it so. But Congress had not also made incompetent testimony which had become accessible by the use of unlawful 'taps', for to divulge that information was not to divulge an intercepted telephone talk. Indeed, the officer might lock what he had heard in his breast, and yet use it effectively enough. He would of course be taking advantage of his crime, but that would not be enough; the testimony he secured would not itself be a forbidden disclosure. So understood, the two cases are consistent, and the accused at bar had no right to a discovery of how the prosecution's case was prepared."

The Supreme Court of the United States took a different view of the effect of the testimony obtained by use of the unlawful "taps," and reversed. Nardone v. United States, 308 US 338, 84 L ed 307, 60 S Ct 266. Mr. Justice Frankfurter, in stating the views of that Court, announced the following principles:

"The issue thus tendered by the Circuit Court of Appeals is the broad one, whether or no § 605 merely interdicts the introduction into evidence in a federal trial of intercepted telephone conversations, leaving the prosecution free to make every other use of the proscribed evidence. Plainly, this presents a far-reaching problem in the administration of federal criminal justice, and we therefore brought the case here for disposition. 308 US 539, post, 454, 60 S Ct 103.

. . . . .

"We are here dealing with specific prohibition of particular methods in obtaining evidence. The result of the holding below is to reduce the scope of § 605 to exclusion of the exact words heard through forbidden interceptions, allowing these interceptions every derivative use that they may serve. Such a reading of § 605 would largely stultify the policy which compelled our decision in Nardone v. United States, supra. That decision was not the product of a merely meticulous reading of technical language. It was the translation into practicality of broad considerations of morality and public well-being. This Court found that the logically relevant proof which Congress had outlawed, it outlawed because 'inconsistent with ethical standards and destructive of personal liberty.' 302 US 379, 384, 58 S Ct 275, 277, 82 L ed 314, 317. To forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.' What was said in a different context in Silverthorne Lumber Co. v. United States, 251 US 385, 392, 40 S Ct 182, 183, 64 L ed 319, 321, 24 ALR 1426, is pertinent here: 'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court, but that it shall not be used at all.' See Gouled v. United States, 255 US 298, 307, 41 S Ct 261, 264, 65 L ed 647. A decent respect for the policy of Congress must save us from imputing to it a self-defeating, if not disingenuous purpose.'

The Court in that case went on to

state that the burden was on the accused, in the first instance, to prove to the trial court's satisfaction that wire tapping was unlawfully employed. Once that was established, the accused was to be afforded the opportunity to prove that a substantial portion of the case against him was the fruit of the poisoned tree. The Government could, of course, establish that its proof had an independent origin.

In United States v. Coplon, 88 F Supp 921, the trial judge proceeded with a thorough pretrial hearing to determine the effect of an unlawful tap on subsequently discovered evidence. He followed the Court of Appeals for the Second Circuit rule that "once the defendant made out a *prima facie* case showing tapping had been used to some extent and the evidence it had produced, the final burden rested on the government to refute the charge." He cited United States v. Goldstein, 120 F2d 485, as his authority. The Supreme Court had affirmed the decision in the Goldstein case but found it unnecessary to determine which party had the burden of proof. However, the Circuit Court for the Second Circuit in United States v. Coplon, 185 F2d 629, in a unanimous opinion held:

"The next question is of the 'taps' taken after January 6th. It is of course well-settled law that 'wire-tapping' is forbidden by statute; and that evidence obtained by a federal officer in violation of law may not be used against the victim of the violation. In United States v. Goldstein we declared what, as we understood the law, was the consequence of 'wiretapping.' The accused has the burden of proving that the prosecution has in fact 'tapped' his wires; but, if he succeeds in doing so, the burden falls upon the prosecution to prove that the information so gained has not 'led,' directly or indirectly, to the discovery of any of the evidence which it introduces. It is true that on appeal although the Supreme Court affirmed our decision, it was careful not to affirm this ruling, and, as we said in our opinion, it was not an

inevitable gloss upon what the court had said in Nardone v. United States. However, we thought then, and we still think, that it best carries out the purpose of the language used, and we shall adhere to it, until we are told that it is wrong. The question in the case at bar is therefore whether the prosecution succeeded in proving that the 'taps' taken between January 6th and March 4th were not necessary to the production of any of the evidence introduced at the trial."

The matter has been before the District Courts in at least two cases and in both instances the court has followed the rule that once the defendant establishes his wires have been tapped, the burden rests on the Government to show that the information it obtained was acquired from independent sources.

Even if the foregoing cases failed to support me I would still be upheld by the wording of the Manual. Words could not be used which more clearly inveigh against the use of any evidence resulting from an illegal intercept. Referring back to my previous quotation from the Manual, I find the following sentence set out therein: "All evidence obtained through information supplied by such illegally obtained evidence is likewise inadmissible."

In applying the foregoing principles to this case I conclude much of the damaging information introduced against the accused was obtained solely by the illegal intercept. A better case of using poisoned testimony to build a case can hardly be imagined. The Government conceded that the identity of the accused was determined by the interception. Knowledge of the language used in the call and the voice identification were derived from the overheard conversation. Furthermore, the confession obtained from the accused was so interwoven with the interception as to be the product of the illegal act. I do not stand alone in that belief as the board of review in its analysis of the issues conceded the confession was a direct product of the interception. Obviously a finding to that effect would be unimportant if

the record was barren of any evidence to support the conclusion but the prime mover (a lieutenant) in the detection and apprehension testified that the monitoring of calls was intensified to catch the offender; that when the call was intercepted he was immediately informed; that he was notified of the place of call and he proceeded to that location where he noticed that the accused was alone and talking over the telephone; that he directed the accused not to return the mouth and ear set to the cradle but the accused failed to comply with the direction; that he thereupon had a telephone circuit completed with the monitor and directed the accused to repeat the obscene part of the conversation over the line; that the monitor identified the voice as being the one which had been intercepted; that the accused was ordered, over his protest, to get his hat and accompany the lieutenant to his office; that during the journey to the office the lieutenant made several statements to the accused substantially as follows: "I caught you in the act and, therefore, you had better give us the full story"; that accused made no statement until the lieutenant explained that the act was "against the social mores of the people, and [suggested] if he [the accused] needed help in straightening out, we wanted to get it for him"; that thereafter in the presence of a Criminal Investigation Detachment investigator, who was immediately available, the accused made an oral statement confessing the commission of the offense; that the interrogation by the lieutenant and the investigator commenced within ten to fifteen minutes after the apprehension; and that subsequently another interview was held, a written confession was obtained from the accused and the oral discussions which formed its basis were recorded by a concealed recording machine. The confessions thus obtained furnished the principal evidence against the accused and that he was prejudiced by their admission goes without saying.

While it must be conceded that a case on all fours with the instant one has not been found, the language used by the Supreme Court in United States v. Nardone, supra, seems to me to be apropos. Stated in a different context it is simply this, for us to forbid the direct use of the words spoken over the wires, but to put no curb on their indirect use, would only invite the use of methods deemed inconsistent with ethical standards and destructive of personal liberty. Certainly, that Court has brooked no departure from the rationale of that case. In Weiss v. United States, 308 US 321, 84 L ed 298, 60 S Ct 269, interceptions were used to obtain confessions from coconspirators. They were used as witnesses by the Government and they read to the jury the transcripts of their conversations. The case is only important for its expression of disapproval of the method of procuring the testimony. Mr. Justice Roberts, speaking for the Court, stated:

"It is said, however, that when some of the defendants pleaded guilty, elected to take the stand and to testify to the contents of the messages, they gave the authorization contemplated by the statute. We have already adverted to the method by which this supposed authorization was obtained. Certain of the defendants who were participants in the telephone conversations were informed of the Government's possession of the contents of their communications. Under the stress of this situation they determined to turn state's evidence. Messman's license to practice medicine has not been revoked; he was not required to plead to the indictment; he was paid a salary by the Government, first of $65 per week and later of $100 per week, amounting, in the total, to $3,237.12. Nelson's sentence was suspended. He was paid a salary of $50 per week. Berger's sentence was suspended. Spitz's sentence was suspended.

"Statement of these facts is convincing that the so-called authorization consisting of the agreement to turn state's evidence, by some of the defendants after they had been apprised of the knowledge of their

communications by the Government's representatives, and in the hope of leniency, was not that intended or described by the statute and emphasizes the offensive use which may be made of intercepted messages, whether interstate or intrastate. It is not too much to assume the interdiction of the statute was intended to prevent such a method of procuring testimony."

Accepting as I do the law as I find it in the Federal civilian courts, I must find the confession to be a direct result of the illegal interception. The circumstances preceding the apprehension; the direction to repeat the conversation over the telephone; the voice identification of the accused at that time; the accusatory statements by the lieutenant that he had caught the accused in the act and he had better tell all; the promise to assist the accused if he needed attention; and the interrogation by the lieutenant and the investigator to wind up the case on the spot, in the short space of fifteen minutes, all seem to argue persuasively that so much of the tainted evidence was used to extract what otherwise might be good, that all must be considered poisoned. There is absolutely nothing intervening which for any practical purpose would insulate the confession from the illegal acts which immediately preceded it. A single uninterrupted transaction from interception to confession is all that is here present. If the former did not induce the latter then I misunderstand the mental processes of a private who is confronted by a superior officer possessed with incriminating facts which were not known to have been illegally obtained. In this case the cat got out of the bag largely because the trap was baited with poisoned meat.

I have not overlooked the fact that the evidence actually introduced at the trial was a written confession and a recorded transcription of questions and answers obtained some ten days after the original incident. However, the burden was on the Government to show there was no causal connection between this disclosure and the previously obtained oral confession. Of course, it did not do that because its theory was that the tapping was legal. But more important, the real purpose of the last interrogation was to reduce what had been said orally to a more acceptable form. It amounted to no more than a repeat performance and the lieutenant testified the microphone set was used principally to establish that the accused had been properly warned. I find nothing aside from the time factor which would remove the taint and I conclude that that standing alone is insufficient to support a finding that the statements used were entirely divorced from the original wrong.

X

There is something said in the record about the right of the Army to monitor calls emanating from telephones installed on military reservations to determine their officiality. I desire to make it clear that I express no opinion on the legality or illegality of that practice. So far, the Supreme Court has not held that Section 605 of the Communications Act denies the military service that power and obviously I do not care to enter that field prematurely. I need merely say that if calls are intercepted the information cannot be used for purposes of supporting criminal prosecution.